431 So.2d 932 (1983)
BROWN MECHANICAL CONTRACTORS, INC.
v.
CENTENNIAL INSURANCE COMPANY, National Union Fire Insurance Company, et al.
GOODNER CONSTRUCTION COMPANY
v.
CENTENNIAL INSURANCE COMPANY, National Union Fire Insurance Company, et al.
MARLEY COOLING TOWER COMPANY
v.
GOODNER CONSTRUCTION COMPANY, Brown Mechanical Contractors, Inc., Republic Steel Corporation, Centennial Insurance Company, and National Union Fire Insurance Company.
CENTENNIAL INSURANCE COMPANY and National Union Fire Insurance Company
v.
MARLEY COOLING TOWER COMPANY.
81-35, 81-36, 81-78 and 81-79.
Supreme Court of Alabama.
January 7, 1983.
Rehearing Denied March 11, 1983.
Rehearing Denied April 22, 1983.
*934 Foster Etheredge and J. Mark Hart, of Spain, Gillon, Riley, Tate & Etheredge, Birmingham, for Brown Mechanical Contractors.
S.R. Starnes and L. Graves Stiff, III, of Starnes & Atchison, Birmingham, for Goodner Const. Co.
William T. Mills, II and Jack B. Porterfield, Jr., Birmingham, for Marley Cooling Tower Co.
Robert D. Norman and Robert L. Williams, of Norman, Fitzpatrick & Wood, Birmingham, for National Union Fire Ins. Co., and Centennial Ins. Co.

ON APPLICATION FOR REHEARING
BEATTY, Justice.
The original opinion in this case, dated September 24, 1982, is withdrawn, and the following opinion is substituted therefor:
These consolidated appeals arose out of a fire that destroyed a partially built cooling tower and damaged its foundation. The structure was promptly rebuilt but the parties could not agree on which contractor *935 bore the risk of loss of the foundation. This convoluted litigation ensued. It took the form of a declaratory judgment action by the insurers to determine their coverage obligation and to pursue their subrogation rights. The resulting decision dissatisfied everyone except the owner of the cooling tower; all the other parties appealed.

I. FACTS
In December 1978 Marley Cooling Tower Company (Marley) contracted to build a cooling tower for Republic Steel Corporation (Republic). Goodner Construction Company (Goodner) entered into a similar contract with Republic to build a concrete foundation for the cooling tower and to install piping, pumps, electrical connections and instrumentation. Goodner engaged various subcontractors, including Brown Mechanical Contractors, Inc. (Brown), for the piping work.
Under their contracts Marley and Goodner each assumed all risk of loss to "the work" during construction, and each agreed to take precautions for avoiding danger to "any property while on Republic's premises." Accordingly, to cover its risk under the contract, Marley took out an insurance policy from the plaintiffs, Centennial Insurance Company and National Union Fire Insurance Company (insurers). The policy provided up to $5 million in coverage against property loss. (Whether or not Goodner obtained insurance coverage does not appear from the record).
On October 17, 1979, a fire completely destroyed the wooden cooling tower and damaged its appurtenant parts (to which we refer collectively as the foundation). The tower was 88% complete. On the day of the fire, no Marley employees were present, having left the site about ten days earlier for Goodner and its subcontractors to complete their phases of the construction. Accordingly, all agree that Marley did not cause the fire; Marley's liability is based on contract, not tort.
The contract dispute underlying this litigation emerged when Republic sought to hold Marley responsible not only for the loss of the cooling tower ($125,439.00) but also for the damage to the foundation ($47,725.76). Marley disagreed and submitted to the insurers a proof of loss for only the cooling tower while reserving the right to add the foundation damages to its insurance claim should the foundation ultimately be held part of Marley's "work" under the contract.
The parties were unable to resolve this dispute. Meanwhile, Marley, at its own expense, rebuilt the cooling tower (which Republic accepted in satisfaction of its claim for the tower itself), and Goodner repaired the foundation damages (Republic paid for these repairs).

II. PROCEEDINGS BELOW
The insurers filed the present declaratory action in time to prevent the statute of limitations from barring their subrogation claim. Named as defendants were Goodner, Brown, Republic and Marley. The insurers sought a declaration that they owed no coverage for the foundation damages, that upon payment of the cooling tower loss they would be subrogated to Marley's rights of recovery and that the negligence of Goodner and Brown caused the fire. The insurers prayed for a judgment in their favor against the defendants responsible for the fire.
Marley's answer included a counterclaim against the insurers, seeking coverage under the policy for what it might owe Republic for the foundation. Marley filed a crossclaim against Goodner and Brown, alleging that their negligence caused the fire, and claiming $173,164.76 as damages for both the cooling tower and foundation. Later, Marley added a cross-claim against Republic for $16,975.00, the difference between the insurance proceeds and the contract price for the completed cooling tower. This amount Republic had withheld as a credit against Marley's possible liability for the foundation damages.
Republic's answer to the insurers alleged that the foundation damages were not covered by the policy. Republic filed a crossclaim *936 against Goodner and Brown for negligently causing both the tower and foundation losses. Later, Republic amended this cross-claim to seek from Goodner alone the foundation damages, based on Goodner's contractual obligation to assume the risk of loss of its work during construction.
Goodner, in its answer to the insurers, denied negligence and raised as a defense the claim that the action was premature and nonjusticiable because the insurers had made no payment to their insureds that would give rise to any subrogation interest. In its answer to Republic's cross-claim, Goodner demanded a jury trial. Finally, Goodner filed a cross-claim against Brown, seeking indemnification under their contract for any damages arising out of the subcontractor's work.
The trial court, after a nonjury trial, resolved these issues in a detailed opinion as follows. First, the trial court rejected Goodner's defense that the action was premature by finding that a justiciable controversy was presented and that the insurers were entitled to subrogation. Second, the court found Marley responsible to Republic under their contract for the foundation damages as well as for the damages to the cooling tower. The court noted that the latter claim was satisfied when Republic accepted the rebuilt cooling tower from Marley, and the former claim ($47,726.76) was subject to a credit of $16,935.00 for the unpaid contract price. Third, the court found that the insurers owed Marley coverage for both the cooling tower and the foundation. Fourth, the trial court found that the proximate cause of the fire was the negligence of Goodner and Brown, who were thus jointly and severally liable to the insurers for the full amount of damages. Fifth, the trial court found as a matter of law that the contract between Goodner and Brown did not require Brown to provide indemnification for Goodner's own negligence.

III. ISSUES
The issues on appeal and our resolution of them are as follows. (A) We reject the contention of Goodner and Brown that the subrogation claim is premature and nonjusticiable. (B) We reject Goodner's claim that it was entitled to a jury trial on the negligence issues. (C) We reverse the trial court's holding that Marley was contractually responsible for the foundation damages and accept Marley's contention that its liability is limited to the cooling tower. Accordingly, we need not consider whether the insurance coverage could extend to the foundation damages. (D) We affirm the trial court's holding that Goodner's and Brown's lack of care was the proximate cause of the fire. (E) We find no reversible error in three evidentiary rulings that Brown disputes. (F) We affirm the trial court's denial of indemnity from Brown to Goodner.

A. SUBROGATION
Goodner and Brown argue that no justiciable controversy exists, because the insurers lack standing to bring this subrogation action until they have paid their insured, Marley. Goodner and Brown rely on the rule in Aetna Insurance Company v. Hann, 196 Ala. 234, 236, 72 So. 48, 50 (1916), that "the right [of subrogation] does not arise until the surety has either paid or offered to pay the debt or demand for which the principal is liable." On the other hand, they recognize "the power of the court to decide in one lawsuit the issues of the insurers' subrogation and liability on a policy of insurance" when liability has not been established nor payment yet made, Barnes v. Tarver, 360 So.2d 953, 956 (Ala.1978), citing Liverpool & London & Globe Ins. Co. v. Federal Land Bank, 233 Ala. 591, 173 So. 91 (1937). However, Goodner and Brown cite dictum in the Liverpool case that requiring prepayment or tender by the insurer "would be well supported if this were an original bill whose equity depended upon the assertion of that claim." 233 Ala. at 593, 173 So. at 91. The authority cited for this proposition is Aetna Insurance Company v. Hann, supra. Goodner and Brown conclude that the present declaratory judgment action is an original bill barred under Hann, in contrast to the insurer's third party *937 claims against subrogation defendants, which were permitted in Liverpool and Barnes, supra.
The flaw in this argument is that the rule making payment a prerequisite to subrogation is for the benefit of the insured. As explained in Aetna Insurance Company v. Hann, supra, an insured's "demand against the wrongdoer must be satisfied so as to relieve him of trouble and risk; and it is this securing of satisfaction by the insured which gives the insurer the right to be subrogated to the rights of the insured against the wrongdoer." 196 Ala. at 238, 72 So. at 51. Thus, it is Marley, not Goodner and Brown who are entitled to object to the lack of payment. In the absence of a demand by Marley that the action be stayed until payment of the insurance proceeds,[1] the rule in Hann will be satisfied simply by making the insurers' judgment against Goodner and Brown contingent upon payment to Marley.[2]
As for the argument that Liverpool prohibits an "original bill" by the insurers absent payment, we see no functional difference between the insurers' impleading third party subrogation defendants (which Goodner and Brown concede is proper) and the present declaratory judgment action. Under either procedure all claims and parties are brought before the court. Examination of the actual holding in Liverpool makes clear that alignment of parties has no significance. In that case the court allowed the insurer's claim, because "the prayer for subrogation is predicated upon the condition that this [payment] shall first be [made]." 233 Ala. at 594, 173 So. at 93. Similarly, in the present case, allowing the insurers a subrogation judgment contingent upon payment to the insured in no way violates the equitable prerequisites for the remedy of subrogation.
Goodner and Brown also contend that the rule in Hann states a requirement of standing: without payment by the insurers no justiciable controversy exists. We disagree. Requirements of standing apply independently of the rule in Hann; in all cases the parties must have a concrete stake in the outcome of the court's decision. Clearly, this requirement is satisfied here because the court can readily enforce payment to the insured, Marley. Were Marley not before the court or were there some other reason to believe payment would never be made, then Goodner and Brown would be entitled to raise the question of standing.

B. GOODNER'S JURY DEMAND
Goodner claims that the trial court disregarded its timely jury demands in violation of its constitutional right to trial by jury, Ala. Const. art. I, § 11. Republic and the insurers argue that the jury demands were untimely or that Goodner otherwise waived its right to a jury trial.
Goodner was of course entitled to seek a jury trial on its tort liability for damages in the procedural context of a declaratory judgment action, Rule 57, Alabama Rules of Civil Procedure. However, to be had as a matter of right a jury trial must be demanded within the time specified by Rule 38(b). This rule requires that a jury demand be served no later than 30 days after the last pleading directed to the issues on which a jury trial is sought. Unless a party specifies issues in his demand, "he shall be deemed to have demanded trial *938 by jury for all the issues so triable," Rule 38(c). Failure to serve a timely demand constitutes a waiver of trial by jury under Rule 38(d). After a proper demand, ordinary principles of waiver and estoppel applicable to any personal right may still operate to bar a jury trial. Once lost as a matter of right, a jury trial may be had only in the court's discretion under Rule 39(b).
To apply these principles it is helpful to set forth the proceedings below, the intricacy of which apparently has confused everyone involved. Goodner's first jury demand, filed as part of its answer to Republic's cross-claim, after Republic had moved for default, read as follows: "Defendant demands a jury for the trial of the issues presented by this cross-claim and all other issues presented in the entire case." Goodner then answered Marley, demanding a jury trial of "all issues under this crossclaim." In next answering the insurers' complaint, Goodner made no jury demand. Republic filed a "Motion to Strike Jury Demand" on the ground of untimeliness. In response the trial court issued the following order on July 2, 1981:
"This cause was duly set on this date upon a motion to strike the jury demand as filed by one of the parties. The Court heard statements and arguments of counsel and finds as follows:
"1. The original action is one for a declaratory judgment and is properly triable before the Court without a jury.
"2. The crossclaims or counteractions filed by parties other than the Plaintiff present issues which may be issues of fact and properly triable to a jury on the law-side of this Court.
"Accordingly, it is CONSIDERED, ORDERED, ADJUDGED and DECREED by the Court as follows:
"ONE: The demand for a jury for the trial of the original action as filed by the Plaintiff against the several Defendants is hereby denied and the cause shall proceed to trial on the date already set for a trial without a jury.
"TWO: The crossclaims and counteractions above-mentioned are hereby each disjoined from the said `main case' for future orders of this Court."
A two-day trial was held. Afterwards the trial court issued a "substitute order," granting Republic's motion to strike Goodner's jury demand as untimely, further granting a nonexistent jury demand supposedly filed by Republic and ordering a bench trial of the entire case except for Republic's disjoined "counterclaim" against Goodner. No further proceedings took place prior to the appeal. A chronology follows:

1980
October 15 Insurer's complaint for
 declaratory judgement v.
 Marley, Republic, Goodner and
 Brown.
November 21 Marley's answer v. insurers and
 cross-claim v. Goodner and
 Brown.
December 23 Republic's answer v. insurers
 and cross-claim v. Goodner and
 Brown.
1981
February 23 Trial court denied Goodner's
 motion to dismiss insurers'
 complaint and allowed Goodner
 20 days to answer insurers.
March 30 Order setting trial for May 19.
April 15 Trial court denied Goodner's
 motion to dismiss Republic's
 cross-claim, gave Goodner 10
 days to answer and again gave
 notice of May 19 trial date.
May 8 Republic's motion for default v.
 Goodner and Brown.
May 11 Goodner's answer v. Republic
 with jury demand and motion
 for continuance of May 19 trial.
May 13 Goodner's answer v. Marley
 with jury demand.
May 18 Trial court granted
 continuance, resetting trial for
 July 13. No ruling on
 Republic's motion for default.
May 26 Goodner's answer v.
 insurersno jury demand.
June 11 Republic's motion to strike
 Goodner's jury demand as
 untimely.
July 2 Trial court's order on Republic's
 motion to strike jury demand.
July 13 & 14 Trial.
August 5 Trial court's "Substitute
 Order," striking July 2 order.
August 31 Final judgment.

*939 Before considering the matter of timeliness, it is first necessary to determine to which issues and parties Goodner's jury demands applied. Arguably, Goodner never sought a jury trial against the insurers, because, after including jury demands with its answers to Republic and Marley, Goodner included no jury demand in its answer to the insurers' complaint, which specifically alleged Goodner's negligence. On the other hand, Goodner's first demand specified that a jury trial was sought for "all issues in the entire case." Moreover, Republic's and Marley's cross-claims had also put in issue Goodner's negligence and the terms of the July 2 order indicate the trial judge understood some party to have demanded a jury against the insurers. In view of these facts and the presumption in Rule 38(c) that jury demands apply to all issues unless specifically limited, we shall assume that Goodner's first jury demand was operative on the negligence issues raised in the insurers' complaint. Cf. Ex parte Collins, 394 So.2d 952 (Ala.1981) (doubt on whether an issue is of a sort triable to a jury should be resolved in favor of a jury trial); Mobley v. Moore, 350 So.2d 414 (Ala.1977) (discretion under Rule 39(b) should be exercised liberally in favor of a jury trial).
Goodner argues that it satisfied the timeliness requirement of Rule 38(b) by including its jury demands with its answers. Republic argues persuasively in reply that its motion for default precluded Goodner from claiming a jury trial as a matter of right, because Goodner's demand was timely only in relation to its late answer, see Dorcal, Inc. v. Xerox Corporation, 398 So.2d 665, 670 (Ala.1981). In Dorcal we noted that a party could preclude filing of a late answer and jury demand by previously "securing an entry of default." Here, Republic's motion for default was never ruled upon. It was sufficient, however, for Republic simply to have filed its motion. The trial court then had discretion under Rule 55 to enter a default judgment and thus preclude an answer and jury demand. Subsumed within this discretion was the alternative of allowing Goodner to proceed, but without a jury. Accordingly, we conclude that the trial court was justified in striking Goodner's jury demand as untimely against Republic.
However, unlike Republic, the insurers did not move for default. Therefore, Republic's own argument shows that Goodner's jury demand was timely against the insurersgiven our assumption that the first jury demand was operative against them.
Accordingly, were timeliness the only issue, the appropriate procedure would have been for both Republic and the insurers to try the issue of Goodner's negligence before a jury. Such a result would follow from the fact that Goodner's jury demand was timely with respect to one of the two pleadings raising identical negligence claims. However, the timeliness issue is not dispositive, because Republic and the insurers contend in the alternative that Goodner proceeded to waive its right to a jury. We agree that Goodner's conduct of the litigation precludes it from now claiming denial of trial by jury. Since Goodner did not intend to give up its right, the issue is best thought of in terms of estoppel, not waiver.[3]
Goodner argues that the posttrial "Substitute Order," which struck its jury demands as untimely, was the first indication that there would be no jury trial on the negligence issues. This argument is inconsistent with what transpired before and during the trial. The order of July 2 specifically denied a jury for the trial of the insurer's original action, while finding that the cross-claims presented issues of fact properly triable to a jury. It was incumbent upon Goodner to inform itself and the *940 trial court that the insurers' complaint sought judgments against Goodner and Brown for their alleged negligence, which was an issue properly triable to a jury.
The confusion became evident at the opening of trial, when the attorneys asked whether Goodner's and Marley's crossclaims were to be tried. This exchange followed:
"THE COURT: Yes. I want to hear everything to conclusion in this case.
"[BROWN'S ATTORNEY]: Well, I understand Your Honor had severed or disjoined the cross-claims. And that was that's my understanding of it. And I came up here on that basis.
"THE COURT: Well, I got so many cases. I can't remember all of them. I will have to read my order. If I did it, I did it.
"[GOODNER'S ATTORNEY]: Here, Your Honor, I have a copy of it.
". . .
"THE COURT: I don't see how I can try the cross-claims since there is a jury demand in the case and they would need the employment of a jury since there has been a jury demand. And this is waivered.
"[MARLEY'S ATTORNEY]: ... I don't want a jury trial in my case. I want the Court to adjudicate the issues that I have with my insurance carrier.
[BROWN'S ATTORNEY]: We join in that also.
"THE COURT: Who demanded the jury?
". . .
[GOODNER'S ATTORNEY]: Our answer to [Republic's] cross-claims contain a request for a jury. We don't want to waive any right to a jury that we may have. However, that's not what I was asking the Court about. What I was concerned about was my cross-claim against Brown Mechanical, which, based on indemnity ... seeks clarification and interpretation.
"THE COURT: I appreciate your calling that to my attention. A cross-claim or counteraction that has a jury demand in it will be disjoined for obvious reasons. And the rest of the counterclaim, crossclaims, would be tried in this action.
". . .
"[INSURER'S ATTORNEY]: One other point of clarification. You said you have a severance of one part of this. Do we have an understanding that we are going forward with the proof of our subrogation claim to a judgment?

"THE COURT: Yes." (Emphasis added.)
Trial proceeded without objection on the issue, among others, of Goodner's negligence. The testimony of Goodner's three witnesses was relevant to this issue, as was Goodner's cross-examination of most of the other witnesses. No objection was made that evidence was irrelevant to the matters Goodner intended to litigate. Near the close of trial, Republic filed in open court a handwritten pleading, adding its contract claim to the negligence cross-claim previously filed against Goodner. This discussion took place:
"[REPUBLIC'S ATTORNEY]: I have placed on your desk an amendment to our cross-claim.
"THE COURT: All right. I will see it.
". . .
"[GOODNER'S ATTORNEY]: Your Honor, point of clarification, the crossclaim has been severed has it not?
"THE COURT: Yes. The one that has a jury demand in it.
"[MARLEY'S ATTORNEY]: Just the one that has a jury demand?
"THE COURT: Is disjoined. I don't know whose that is. I don't remember off-hand.
"[GOODNER'S ATTORNEY]: Your Honor, if there is any contention that we are going to try the issues by the amendment in this litigation, looks like to me
"THE COURT: Is this the one with the jury demand? We are not going to try it in this court.
"[GOODNER'S ATTORNEY]: Okay."
We agree with Goodner that the trial court's announced intention at the beginning *941 and end of trial was to hear only those issues which were not the subject of a jury demand. However, Goodner was obliged to inform the trial court that its intentions were not being followedthat the insurers were litigating negligence issues for which Goodner had demanded a jury. The problem was apparent from the court's pretrial order and from the initial discussion at trial, when the insurers obtained everyone's assent to "going forward with the proof of our subrogation claim to a judgment." Goodner's explanation for its failure to act is that "all aspects of the case, including Goodner's involvement, would have to be tried in order to resolve both the insurers' claims against Brown Mechanical and Goodner's cross-claim for indemnity, as to which Brown never requested a jury!" We do not think it was reasonable for Goodner to contemplate that its "involvement" would be litigated but not decided. Goodner should have known that the insurers sought, and the court had power to enter, a final judgment on all litigated factual issues. Clearly, a final judgment is binding regardless of who was the trier of fact.
We conclude that Goodner is estopped from now claiming a jury, because it assented to a nonjury trial in what it should have known would be its only chance to litigate. That its assent may have been unintentional does not require that Goodner be given another chance. For example, an inadvertently late jury demand creates a "waiver" under Rule 38(d). Federal courts have reached similar results in applying constitutional and procedural requirements comparable to our own. See 9 C. Wright & A. Miller, Federal Practice and Procedure § 2321 at 101 (1971) ("it is clear that the test of waiver that is applied to other constitutional rights, that there must have been `an intentional relinquishment or abandonment of a known right or privilege,' is not applicable to the right to trial by jury"), Fenstermacher v. Philadelphia National Bank, 493 F.2d 333, 338 (3rd Cir. 1974) (where plaintiff sought final equitable relief and acquiesced in consolidated hearing on preliminary injunction and the merits, he effectively waived jury trial though time for demand had not passed). Southland Reship, Inc., v. Flegel, 534 F.2d 639, 643-45 (5th Cir.1976) (after timely demand, party waived right to jury demand on liability issue by acquiescing in consolidated nonjury hearing with later jury trial limited to damages issue).

C. MARLEY'S CONTRACT LIABILITY
The impasse over the insurance claim arose because Marley and Republic could not agree on the meaning of paragraphs 12(a) and 16(d) of their contract. Paragraph 12(a) was entitled "Responsibility for Work and Insurance" and provided:
"Prior to the completion of the work by Contractor and the acceptance thereof by Republic, the work shall remain at the risk of Contractor and unless otherwise specified Contractor shall be responsible for all loss and damage to the work and shall repair, renew and make good, at its own expense, all such loss and damage, however caused, whether or not due to the fault of Contractor."
Paragraph 16 was entitled "Safety of Persons and Property" and subparagraph (d) provided:
"Contractor shall take all necessary measures and precautions to protect and to avoid damage to or loss of any property while on Republic's premises. Such measures and precautions shall include, but shall not be limited to, all necessary safeguards for warning and protecting workmen and others against hazards and to prevent accidents of any kind whenever work is being performed in proximity to any moving or operating machinery, equipment or facilities."
The trial court rejected the contention of Marley and the insurers that Marley was responsible only for the loss of the cooling tower. The trial court found that the first sentence of paragraph 16(d) made Marley responsible for the foundation damages as well. The trial court further held that "the work" in paragraph 12(a) for which Marley was responsible included both the cooling tower and the foundation.
*942 The scope of our review of the trial court's conclusion depends on the role that court assumed in construing the contract.
"Alabama law requires the trial court to determine whether a contract is ambiguous, and if it is not, to determine the force and effect of the terms of the contract as a matter of law.... Extrinsic evidence may be admitted to interpret a contract only if the trial judge finds as a matter of law that the contract is ambiguous...." (Citations omitted.)
Wigington v. Hill-Soberg Company, Inc., 396 So.2d 97, 98 (Ala.1981). The threshold issuewhether or not the contract is ambiguousis itself a question of law. Holt v. Davidson, 388 So.2d 548 (Ala.1980). In answering this threshold question, the trial court may consider extrinsic evidence in order to determine whether there is a latent ambiguity arising from some collateral matter outside the writing. Mass Appraisal Services, Inc., v. Carmichael, 404 So.2d 666, 672 (Ala.1981); Gibson v. Anderson, 265 Ala. 553, 92 So.2d 692 (1957).
Here, the trial court did not address the threshold issue. We find as a matter of law that the contract is not ambiguous and that the trial court erred in its interpretation.
Marley signed a contract to build a "cooling tower on land of Republic." Presumably, "the work" in paragraph 12(a) refers only to the subject matter of the contractthe cooling tower. Nothing in the contract suggests otherwise; no ambiguity is apparent. Conceivably, however, the parties understood this language to mean all of the work at the construction site, including Goodner's work on the foundation. To determine whether that was the understanding, the trial court could have compared the provisions of Goodner's contract. Consideration of such extrinsic evidence is necessary to determine whether there is a latent ambiguity in contractual language clear on its face. Goodner's contract contains the same paragraphs 12(a) and 16(d). (Republic used the same preprinted form for both Marley's and Goodner's contracts.) Clearly, then, the only plausible interpretation of paragraph 12(a) is that each contractor bore the risk of loss for its own work.
Similar reasoning applies to paragraph 16(d). Viewed in isolation that paragraph makes Marley responsible only for losses resulting from its own negligence. The paragraph's literal meaningthat Marley is responsible for all of Republic's property losses from whatever causeis obviously not intended. And, when one compares Goodner's contract and finds the identical provision, it is equally obvious that Marley is not liable for the damages to Goodner's construction. No basis whatsoever exists in the contract or elsewhere for making Marley bear the loss of anything other than its own work, the cooling tower. Marley never agreed to insure Republic's entire plant which is in effect what Republic contends. In view of the identical contract provisions and the absence of any contention that Marley caused the fire, it is arbitrary to throw the foundation loss on Marley simply because the fire apparently began in its cooling tower.[4]
The insurers agree that they must pay the cooling tower loss to Marley. We need not address the insurers' refusal to cover the foundation damages since we find their insured is not liable for those damages.

D. CAUSATION
Goodner and Brown do not appeal the finding that they breached a duty of care but argue that there was no basis for holding their breach to be the cause of the fire. The mere possibility that a careless act caused damage is not itself sufficient to find proximate cause. E.g. Alabama Power Company v. Bryant, 226 Ala. 251, 146 So. 602 (1933). To them the evidence revealed several equally possible causes, and the trial court's selection of one was based on speculation and conjecture.
*943 The detailed findings concerning the fire comprised five pages of the trial court's opinion and may be summarized as follows. Goodner, as a prime contractor, was responsible for assuring safety and overseeing the subcontractors, including Brown. Goodner's supervisor knew Brown's employees were welding at the top of the cooling tower on the afternoon of the fire, yet he did not follow his normal practice of checking their work area either during or after the welding.
For its part, Brown, according to the trial court, failed to take such precautions as covering or wetting down the plywood platform on which the welding was done, having fire extinguishers or water readily available, or keeping a fire watch after completion of the welding. It was undisputed that sparks and molten metal from the 30-second tack weld spattered onto the plywood and could have fallen through drainage holes into the cooling tower. Yet, no one checked inside the tower for signs of smoke or fire. The fire was first spotted about five hours later in the cooling tower's southwest cornerwhere Brown's welding had been done.
The trial court discussed the testimony of two expert witnesses. Forrest Smith, Republic's welding supervisor, testified that Brown's procedures were not safe and customary in the welding trade. For example, there should have been a four-hour fire watch. Leo Reynolds, the city fire marshal, concluded from his investigation that the welding was the most probable cause of the fire. He considered the other possible origins and decided that the welding was, in the court's words, "the one and only source of ignition which could not be accounted for."
In reviewing the trial court's factual conclusion on the causation issue, we are of course bound by the ore tenus rule, which accords a presumption of correctness to findings based on conflicting testimony. Therefore, we must accept the decision below unless it is clearly erroneous and against the great weight of the evidence. E.g., Cherokee Insurance Company v. Frazier, 406 So.2d 881 (Ala.1981).
Goodner and Brown first argue that Reynolds testified only that the welding was a "possible" cause of the fire, not that it was the "probable" cause. It is true that in his investigation report and in much of his testimony Reynolds referred to welding as a "possible" cause of the fire. However, he gave reasons to doubt all of the alternative possible causes, and his testimony makes perfectly clear that he considered the welding the most likely cause of the fire. For example, to the question, "What did you find in the way of a source of fire or flame," he answered unequivocally, "The only thing I could determine was welding." The trial judge recognized the importance of this issue and specifically questioned Reynolds to distinguish between certain, probable and possible causes.
Goodner and Brown also argue that Reynolds's conclusion was based on the false assumption that the plywood was cracked and splintered from age and use. In fact, the plywood was new, smooth-surfaced and tightly fitted together with higher moisture content than old wood. However, nothing in Reynolds's testimony requires assuming that the plywood was old and full of cracks. He testified that a single spark smoldering in a single crack for several hours could have caused the fire. Goodner and Brown also ignore the alternative that the fire could have started from welding spatter falling through the drainage holes and smoldering inside the cooling tower. Thus, the trial court had a reasonable basis for relying on Reynolds' conclusion.
Brown's welding expert, H.B. Rucker, testified that based on his specific knowledge of "the heat content of weld spatter" the molden metal would not have been hot enough to start the fire. Goodner argues that Ruckner's expert testimony was uncontradicted except by Reynolds, who admitted he was unfamiliar with the heat content of the weld spatter, a matter exclusively within the knowledge of experts. Goodner thus contends that the trial court was bound to accept the opinion of the only *944 qualified expert, Rucker. However, Goodner ignores the testimony of another expert, Forrest Smith, who was qualified to speak on this issue and who supported Reynolds's belief that the weld spatter was capable of igniting a fire in these circumstances. Thus, there was a conflict in the opinions of the experts, and the trial court was bound by neither. Dyer v. Traeger, 357 So.2d 328 (Ala.1978).
The reasons given by Reynolds for rejecting the alternative possible causes of the fire are at least tenable and often convincing. No good reason to reject Brown's welding as a cause of the fire is evident. The trial court had the best opportunity to evaluate the witnesses and weigh the conflicting evidence. Therefore, we cannot possibly reverse the decision here as clearly erroneous.

E. EVIDENTIARY ISSUES
Brown argues that the trial court erroneously admitted three pieces of evidence relevant to the causation issue. First, Brown objects to the following question directed to Reynolds by the insurers' attorney:
"And insofar as the investigation that you made into this fire, I understood you yesterday to say that after considering all of the possibilities that it was your best judgment that the cause of the fire was sparks from welding at the scene?"
Brown objected that this question was leading and that it misstated Reynolds's prior testimony, which was that "the possible cause of the fire could have been the welding torch or the sparks from the welding torch." However, Brown had immediately moved to exclude this earlier testimony because of the word "possible." The court allowed the testimony after further questioning made clear that Reynolds considered Brown's welding to be the cause according to his "best judgment." Therefore, the question to which Brown now objects accurately restated Reynolds's testimony. Although the question was leading, the trial judge has discretion to allow some leading questions, especially since prior testimony is simply being repeated. See Sprinkle v. State, 368 So.2d 554, 563 (Ala.Cr.App.1978).
Second, Brown argues that it was error for the trial court to admit in evidence a letter received by Reynolds from one of the subcontractors. Brown argues that this letter was hearsay because it was offered to prove an assertion that "cutting work" with an acetylene torch near the tower was completed by noon on the day of the fire. Reynolds testified that this time factor, as revealed in the letter, was one reason why he ruled out the "cutting work" as the cause of the fire.
We find that the letter did not operate as hearsay evidence, because the record supports Republic's contention that the letter was offered to show the basis of Reynold's expert opinion.[5] Although his opinion may have been subject to impeachment for lack of an adequate factual basis,[6] the trial court had discretion to admit the letter for its limited purpose.[7]
Third, Brown argues that the trial judge's questioning of Reynolds (noted in Part D above) was leading and suggestive.
*945 No objection was made at trial, and we therefore need not review this questioning, which in any event appears proper.

F. INDEMNITY
The final issue concerns Brown's liability to Goodner under the indemnification provision of their contract, which reads as follows:
"The Subcontractor [Brown] hereby covenants to defend, indemnify, save harmless and exonerate the Contractor and the Owner as to and from all liability, claims, lawsuits and demands for personal injury and property damage arising out of work undertaken or to be performed by the Subcontractor, its employees, agents and subcontractors, and arising out of any other operation no matter by whom performed for and on behalf of the Subcontractor. The Subcontractor's above described liability insurance policies shall each contain contractual insurance coverage so as to protect the Contractor and the Owner under this indemnity agreement." (Emphasis added.)
The trial court held that this provision was insufficient as a matter of law for Goodner to be indemnified for its own negligence under Industrial Tile, Inc. v. Stewart, 388 So.2d 171 (Ala.1980).
In Industrial Tile we held that indemnification for one's own negligence is available only where "the parties knowingly, evenhandedly, and for valid consideration intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language," (emphasis added), 388 So.2d at 176. In that case the indemnity provision specifically made the contractor:
"`solely responsible to indemnify and hold harmless the Owner ... from and against any and all claims ... arising out of or occurring in connection with the performance of the work to be done pursuant to the contract and whether or not caused by or contributed to, or alleged to have been caused by or contributed to, by the active, passive, affirmative, sole or concurrent negligence or breach of any statutory duty, whether non-delegable or otherwise on the part of the owner....'"
In Industrial Tile we found this language sufficient to reverse dismissal of the indemnity claim. The language of Goodner's and Brown's agreement, by contrast, is less clear, because Brown does not agree in so many words to indemnify Goodner for liability resulting from the latter's negligence. However, under Industrial Tile, such "talismanic" language is not necessary if the requisite intent is otherwise clear. The opinion in Industrial Tile expressly follows numerous earlier cases[8] in which provisions that lacked specific reference to the negligence of the indemnitee were enforced. Since Industrial Tile, we have twice upheld similar indemnity claims based on language contained in a deed and in a lease, Eastwood Lands, Inc. v. United States Steel Corp., 417 So.2d 164 (Ala.1982); Mitchell v. Moore, 406 So.2d 347 (Ala.1981).
The language of the indemnity provision here at first glance supports Goodner's claim. We have upheld the trial court's finding that Brown's welding was the source of the fire. Therefore, Goodner's liability can be viewed as "arising out of" Brown's work in the sense that the fire and Goodner's related tort liability would not have come about but for Brown's welding. Nevertheless, with respect to indemnification for Goodner's own negligence, the language quoted and emphasized above is ambiguous. It refers only to work performed "by ... for and on behalf of the subcontractor." This language need not encompass Goodner's own independent actions, which included, according to the trial court in a finding not contested on appeal, "failing to carefully supervise the work of its subcontractor, Brown."
*946 Thus, the language of the contract does not clearly and unequivocally express an intent that Brown indemnify Goodner for the latter's negligence. This conclusion is reinforced by comparison with our previous decisions. An important factor has been "the general rule that an ambiguous contract is to be construed against the party whose language is construed," U.S. Fidelity & Guaranty Co. v. Mason & Dulion Co., 274 Ala. 202, 206, 145 So.2d 711 (1962). That case involved a "Uniform Subcontract" with language of indemnity similar to the language used by Goodner and Brown. The court found that "if the Indemnity Agreement is to be given the meaning which [the indemnitee] says it must have," then it is ambiguous because of another inconsistent provision in the contract requiring each party to reimburse the other for damages resulting from a wrongful act of the other. 274 Ala. at 208, 145 So.2d 711. This inconsistency, concluded the court, had to be resolved against the "contractor [indemnitee] who had prepared the agreement," 274 Ala. at 209, 145 So.2d 711. See also Georgia, Florida, Alabama Transportation Co., Inc. v. Deaton, Inc., 293 Ala. 371, 375, 304 So.2d 168 (1974). Here the contract was a preprinted form of Goodner's.[9] Clearly, we must construe the ambiguity noted above against Goodner.
Another factor important in the earlier cases is the degree of control retained by the indemnitee over the activity or property giving rise to liability. We have held equipment lessors entitled to indemnity for their own negligence in part because their lessees had complete control over the use of the equipment. Georgia, Florida, Alabama Transportation Co., Inc. v. Deaton, Inc., supra; Eley v. Brunner-Lay Southern Corp., Inc. 289 Ala. 120, 266 So.2d 276 (1972). Goodner's claim for indemnity is not comparable to the claims of the equipment lessors in those cases because Goodner is liable as a prime contractor for failure to exercise proper control over its subcontractor.
Goodner cites in support of its claim Mitchell v. Moore, 406 So.2d 347 (Ala.1981), because there we allowed indemnity without language specifically referring to the negligence of the indemnitee. In that case a store lease in a shopping center required the landlord to indemnify the tenant-store for damages from injuries in common areas. Both parties to the lease were found negligent in a suit by a store customer who fell in the common area. We held that the "landlord-drafted lease agreement ... clearly indicated an intention to indemnify," when "the plain language of the lease" made the landlord responsible for maintenance of the common areas. 406 So.2d at 354. Thus, with respect to each one of the factors discussed abovethe contractual language, the identity of the draftsman of the language, and the indemnitee's retention of controlthis case supports our denial of indemnity to Goodner.[10]
Accordingly, we affirm on all issues except Marley's contract liability to Republic for the foundation damages. The judgment below is due to be reversed in part and the case remanded for entry of judgment among the parties in accordance with this opinion.
*947 ORIGINAL OPINION WITHDRAWN AND OPINION SUBSTITUTED; REHEARING DENIED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and SHORES and ADAMS, JJ., concur.
JONES, J., concurs in the result.

ON SECOND APPLICATION FOR REHEARING
BEATTY, Justice.
We seem unable to complete this case. In response to our substituted opinion, the parties have now asked us to modify the judgment for clarification of Goodner's and Brown's liability for the foundation damages, the ten percent affirmance penalty under Code of 1975, § 12-22-72, and interest on the judgment. We had remanded the case for entry of judgment among the parties in the expectation that the trial court would dispose of such matters. In order to help the trial court do so promptly, we extend our opinion to address the questions raised by the parties.
Republic asks that we modify our opinion to order Goodner and Brown to pay Republic for the foundation damages ($47,725.76). However, the trial court did not have occasion to enter final judgment in favor of Republic against Goodner and Brown, because of its view that the foundation damages would be paid through the insurers. Since we have found that the insurers owed no coverage for the foundation, the appropriate procedure is for the trial court to enter judgment against Goodner and Brown in the amount of the foundation damages pursuant to Republic's cross-claim for negligence. (This renders moot Republic's contract cross-claim against Goodner alone.)
Both Republic and the insurers ask that we order Goodner and Brown to pay the ten percent affirmance penalty under Code of 1975, § 12-22-72. This statute provides that when a money judgment stayed on appeal by bond is affirmed, the judgment entered by the appellate court must include ten percent of the amount affirmed "as damages." This is a matter we normally consider on petition for rehearing, e.g. Snellings v. Builders' Supply, 229 Ala. 1, 155 So. 858 (1934).
With respect to Republic, this statute is inapplicable for we have not reviewed a final judgment in favor of Republic against Goodner and Brown, as noted above. With respect to the insurers, there was not an outright affirmance of their judgment against Goodner and Brown, for we made the judgment contingent upon payment to the insured. This constitutes a substantial change in the decree favorable to the appellants sufficient to preclude application of § 12-22-72. See Chapman v. Rivers Construction Co., 284 Ala. 633, 227 So.2d 403 (1969) (no ten percent penalty where judgment on appeal increased the amount but discharged the lien awarded by trial court to secure the judgment).
Goodner and Brown also contend that their liability for interest on the insurers' $125,439.00 judgment for the cooling tower did not accrue until the insurers paid that amount to their insured, in view of our decision that the insurers' judgment must be contingent upon such payment. Goodner and Brown are correct on this point, which the insurers do not contest in brief.
Accordingly, we hold that Goodner and Brown are not liable to Republic or the insurers for the statutory affirmance penalty. We remand the case for the trial court (1) to enter judgment for Republic against Goodner and Brown in the amount of the foundation damages and (2) to determine interest accrued on the insurers' judgment since payment to their insured.
OPINION EXTENDED; APPLICATION OVERRULED.
TORBERT, C.J., and JONES, SHORES and ADAMS, JJ., concur.
NOTES
[1] Marley would only have been entitled to demand the undisputed portion of its insurance claim (i.e. the $125,439.00 for the cooling tower). No payment obligation would arise for the disputed claim for the foundation damages until a final judgment on that issue, see Liverpool and Barnes v. Tarver, supra.
[2] To get around this difficulty with their positions, Goodner and Brown argue that there is a public policy favoring prompt payment to the insured. We do not believe that any such policy operates to shield Goodner and Brown from an adjudication of their liability to the insurers when Marley has not objected. See Consolidated Edison Co. of N.Y., Inc., v. Royal Indemnity Co., 41 A.D.2d 37, 340 N.Y.S.2d 991, 994 (1973), where the court noted the policy provision conditioning subrogation upon payment by the insurers. The court stated that this provision was for the benefit of the insured, whose interest in prompt payment could not be used by the tortfeasor to escape liability.
[3] We do not consider Republic's contention that Goodner had already acquiesced in a nonjury trial by the time of its first jury demand only eight days before the original trial date. We assume that continuance of the trial from May to July rendered largely moot any contention that the last-minute jury demand frustrated reliance by the other parties and the court on the plan for a bench trial.
[4] Because Marley's contract is unambiguous, when viewed in light of Goodner's contract, we do not consider the trial testimony on this issue.
[5] Republic also argues that the letter was admissible as substantive evidence under the business records exception to the hearsay rule, because the letter was part of Reynolds's investigative file. See Rule 44(h), A.R.Civ.P. We need not consider this argument because at trial the letter was offered specifically to show the basis of Reynold's expert testimony.
[6] In general, only hearsay that is customarily relied upon by experts and likely to be trustworthy is a proper basis for an expert opinion. E.g., Ex parte Graham, 380 So.2d 850 (Ala. 1979) (to show basis of expert appraiser's property valuation, hearsay evidence of other land sales is admissible). Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974) (expert medical opinion may be based on medical history as stated by patient). See generally, E. Cleary, McCormick on Evidence, §§ 15, 247 (1972).
[7] We do not suggest, however, that hearsay is admissible whenever it is assertedly offered to show the basis of an expert opinion. In jury cases the trial court should consider excluding such evidence as unduly prejudicial or at least adding a cautionary instruction. Cf. Bryan v. John Bean Division of FMC Corp., 566 F.2d 541, 545 (5th Cir.1978).
[8] See W. Roedder "Contractual Indemnity in Alabama," 33 Ala.Law Rev. 31, 39-40 (1981), for summary of the degree of specificity required in the cases prior to Industrial Tile. See also Southern Railway Co. v. General Television Arts, Inc., 556 F.Supp. 86 (N.D.Ala. 1982).
[9] We have examined only the portion of the subcontract that was appended to Goodner's initial brief, which explains that the entire subcontract was admitted in evidence but misplaced prior to the assembly of the record for appeal. This subcontract appears to be a slightly modified version of the same document that was construed in U.S. Fidelity & Guaranty Co. v. Mason & Dulion Co., supra. The portion available to us in this case includes the indemnity clause but does not include the additional inconsistent clause discussed in the earlier case.
[10] Goodner in brief argues that it asserted a second theory of indemnity "based upon the distinction between active and passive fault discussed in Mallory Steamship Co. v. Druhan, 17 Ala.App. 365, 84 So. 874 (1920)." Indeed, Goodner's amendment to its cross-claim against Brown does allege that its negligence, if any, was only passive. However, we find this theory insufficiently argued for us to consider it on appeal. No additional citation of authority is given, and the only discussion offered is an explanation that Goodner's fault arose out of the alleged primary failure of Brown to properly safeguard the welding. Moreover it is not at all clear that this theory was pursued below. The trial court's decree does not discuss this second theory, and we are given no citations to the record showing that it was argued.