Regional Health Services and Hale Health Corporation appeal from a judgment based upon a jury verdict awarding the Hale County Hospital Board a total of $289,440.93 on its claim that the defendants wrongfully converted three checks.
Regional Health Services (hereinafter "RHS") is a corporation in the business of leasing, operating, and managing hospitals. On October 1, 1983, the Hale County Hospital Board (hereinafter "Board") entered into a hospital lease agreement with Hale Health Corporation (hereinafter "HHC"), a wholly owned subsidiary of RHS, to lease the Hale County Hospital in exchange for the payment of rent. Rent was $100,000 per lease year paid in monthly installments of $8,333.33. The lease transferred all of the Board's tangible and intangible personal property, including cash, accounts receivable, and assets, and all of its liabilities, to HHC for the operation of the hospital.
The term of the lease was five years, commencing on October 1, 1983, and ending on September 30, 1988. However, the lease also contained a termination clause by which HHC could terminate the lease after the expiration of two years, upon 90 days' written notice to the Board.
After experiencing severe financial losses in its operation of the hospital, HHC timely exercised the termination option of the lease in July 1985. Because the lease was silent as to the distribution of assets and liabilities upon early termination of the lease, the Board and HHC attempted to negotiate a settlement.
Through a series of proposals and counter-proposals, HHC offered to leave the Board in the same net-asset position that the hospital was in on the first day of the lease. The Board argues that it never agreed to the "net-asset comparison"; however, there is evidence that its acting chairperson did sign a letter acknowledging HHC's intent as to the net-asset comparison.
The lease was terminated as of September 30, 1985. In October 1985, HHC demanded from the Board $168,000, which, it contended, represented the difference in the net assets transferred to HHC on October 1, 1983, and the net assets transferred back to the Board on September 30, 1985, including the cost of certain equipment that the Board indicated that it wanted to purchase from HHC. HHC provided the Board with copies of a balance sheet indicating the difference between net assets at the beginning and at the end of the lease as $168,000.
During the next few weeks settlement negotiations continued between HHC and the Board. Throughout these negotiations the Board was represented by able counsel, as well as by its accountant. The Board eventually offered to settle with HHC and RHS for $34,445.07. That amount included the purchase of certain equipment from HHC, a credit for employee health insurance paid by HHC, and a deduction for a portion of the September lease payment. A release was executed on February 20, 1986, and it provided in part:
 "Whereas, by mutual consent of both parties hereto the parties did agree and did terminate by the terms of the contract the said contract effective October 1, 1985, and in turn on said date the leased premises was turned back and accepted by the [Board], and
 "Whereas, there is certain equipment located within the former leased premises owned by [HHC] which the [Board] desires to purchase, and further, the said [Board] desires to repay payments made through [HHC] for insurance payments in the amount of $26,262.00 and [HHC] desires to pay its September lease payment in the amount of $2,083.00 to the [Board], all as set forth in a letter from the [Board] to Regional Health Services, Inc. dated January 15, 1986, and a copy of the said letter is attached hereto, and
 "Whereas, the parties are desirous of cancelling and terminating the said lease in its entirety and putting the same to rest for any claim or claims that one may have against the other and they do agree as follows:
 "In consideration of $34,445.07 being paid to [HHC] by the [Board] for the said equipment as set forth, the repayment of *Page 111 
insurance premiums minus a deduction for September lease money, [HHC] does hereby release the [Board], its successors and assigns, from all liability that may have resulted from the cancellation and termination of the said lease contract dated October 1, 1983, and in consideration of the [Board's] accepting the leased premises, the Hale County Hospital located in Greensboro, Alabama, back from [HHC] on the 1st day of October, 1985, it [the Board] does hereby release [HHC], its successors and assigns, from all liability that may have resulted from the said lease dated October 1, 1983. That is, there shall be no claims or lawsuits from either party to the other and the contract is considered satisfied, cancelled and no further claims shall run from one party to the other.
 "This agreement is a release in full by both parties against the other for all damages, personal or property, that one may bring against the other from this date forward."
(Emphasis added).
When the Board initially entered into the lease agreement with HHC, the hospital employees became ineligible to participate in the State Retirement System. The hospital employees who were "vested" could keep their funds in the system or withdraw their money. The employees who were not vested received funds for the amounts they had contributed to the retirement fund.
In January 1984, the hospital received a check from the Retirement Systems of Alabama in the amount of $119,904. That amount represented the funds that the hospital had paid to the Retirement System for the benefit of its employees. Upon receipt of the check, the business manager asked the vice president of HHC, who was responsible for operating the hospital, what to do with the check. According to the Board, he replied, "Write a receipt for it and put it in the drawer until you deposit and don't say anything to anybody about it." It is undisputed that the check was deposited in the hospital's account and was used by HHC for the operation of the hospital.
On February 6, 1984, the hospital received $10,889.70 from Blue Cross-Blue Shield in payment of a retroactive settlement from Medicare for the cost reporting period that had ended September 30, 1983. On May 7, 1984, the hospital received $79,000 from Medicare for another retroactive settlement due for the cost reporting period that had ended September 30, 1983. A retroactive settlement occurs when the hospital has been overpaid or underpaid after totalling the monthly payments received during the cost reporting period. The Board contends that the checks covered the period of time preceding the inception of the lease, when the Board operated the hospital. It is undisputed that the checks were deposited in the hospital's account and used in the operation of the hospital. There was also evidence that the two checks were reflected on the balance sheets provided to the Board.
The lease contained the following provision with regard to retroactive settlements:
 "Third-Party Payment Programs. Lessor shall cause to be properly prepared, signed, and timely filed all claims, cost reports, or other documentation required by the Medicare Program, Medicaid Program, and any other third-party payor for the operations of the Leased Premises prior to the commencement of the Lease Term. Lessor shall solely benefit or be liable for any underpayments or overpayments, respectively, made to Lessor by any third party payor for any period prior to the commencement of the Lease Term."
The lease also contained a provision stating that HHC would be transferred "value equal to all the accounts and notes receivable from governmental or other third party payors which receivables by law or contract may not be assigned." The apparent effect of the two provisions was to except from transfer the payments from third-party payors that by law were not assignable, but to transfer the "equivalent" of the assets to HHC. *Page 112 
HHC argues that the Board actually knew about the receipt of the checks or was shown documents reflecting those amounts as assets of the Board when negotiating the settlement to terminate the lease. HHC further argues that the Board was given credit on the comparative balance sheet for the check from the Retirement Systems as an "other account receivable" and for the Medicare checks as "retroactive settlements," another receivable asset of the Board. The Board claims that it was never informed about receipt of any of the checks prior to its execution of the release. The Board further claims that the checks were the property of the Board and were wrongfully converted by RHS and HHC.
On February 12, 1988, the Board sued RHS and HHC, seeking declaratory relief and asserting claims based on fraud, money had and received, unjust enrichment, conversion, and breach of the lease agreement. HHC and RHS answered the complaint and asserted the affirmative defenses of the statute of limitations and release.
On September 23, 1988, RHS and HHC filed a motion for summary judgment. The primary ground for their motion was that the release barred all claims asserted by the Board in its complaint. The trial judge denied the motion, and the case proceeded to trial.
At the close of the Board's evidence and again at the close of all the evidence, RHS and HHC moved for a directed verdict based on the release. The trial judge denied the directed verdict, based on his ruling that the release did not bar any tort claims, including conversion.
The case was ultimately submitted to the jury only on the conversion claim. The jury returned a verdict for the Board and against RHS and HHC in the amount of $90,589 in compensatory damages and $10,000 in punitive damages on the Board's claim that the defendants had converted the checks from Blue Cross and Medicare. The jury also returned a verdict in the amount of $119,904 in compensatory damages and $10,000 in punitive damages on the Board's claim that the defendants had converted the check from the Retirement Systems of Alabama. Judgment was entered against the defendants in the amount of $289,440.93 — representing $210,493 in compensatory damages, $20,000 in punitive damages and $58,947 in interest.
The defendants timely filed a motion for judgement notwithstanding the verdict, or, in the alternative, for a new trial. The trial court failed to enter an order within 90 days from the date of the filing of the motion, and the motion was deemed overruled by operation of law, pursuant to Rule 59.1, A.R.Civ.P. The trial court entered an order after the expiration of 90 days ordering a remittitur, but purporting to deny the motion for new trial.[1]
RHS and HHC raise several issues on appeal, but we need address only one. That issue is whether the trial court correctly concluded that the release was unambiguous and did not bar the Board's conversion claim.
This issue was properly a question of law for the trial court. Brown Mechanical Contractors, Inc. v. CentennialInsurance Co., 431 So.2d 932 (Ala. 1983). In order to determine whether the language of the release was unambiguous, we must give the words of the release their ordinary meaning. FoodService Distributors, Inc. v. Barber, 429 So.2d 1025 (Ala. 1983). Written releases must also be given effect "according to their terms and the intentions of the parties thereto." Ala. Code 1975, § 12-21-109.
The "ordinary meaning" of the language in the release is comprehensively expressed with respect to the claims it sought to release. Reviewing the language within the four corners of the release, we find it *Page 113 
apparent that the essence of the release was to prevent the parties from asserting any claims that might arise out of the lease. The intent of the parties was expressed in the language stating that they were "desirous of cancelling and terminating the said lease in its entirety and putting the same to rest for any claim or claims that one may have against the other." The release exhaustively sought to release and discharge the parties "from all liability that may have resulted from the said lease," and it added:
 "That is, there shall be no claims or lawsuits from either party to the other and the contract is considered satisfied, cancelled and no further claims shall run from one party to the other.
 "This agreement is a release in full by both parties against the other for all damages, personal or property, that one may bring against the other from this date forward."
(Emphasis added.) This language indicates that the intention of the parties was to forever extinguish any claims involving the lease of the hospital.
In Alabama Power Co. v. Blount Brothers Corp., 445 So.2d 250
(Ala. 1984), this Court reviewed the language of a release arising out of a contract dispute. Blount Brothers and Alabama Power had contracted to construct a dam, and after the dam was completed, a dispute arose between the parties over sums due because of delays in the construction. The claims were settled and the parties entered into a release agreement. The language in the agreement was in the terms of a general release, but the parties expressly reserved and excepted certain claims from the release. The dam failed five years after it was completed. Alabama Power sued Blount Brothers, as well as other defendants, on the grounds that the contract had been breached and certain work had been performed negligently.
Blount Brothers moved for summary judgment based upon the terms of the release agreement. The trial court found, as a matter of law, that the terms of the release were unambiguous and that they barred Alabama Power's claims, both in contract and in tort, against Blount Brothers. 445 So.2d at 251.
In giving the words of the release agreement their "ordinary meaning," we stated:
 "The ordinary meaning of the language employed in APCO's release is comprehensive and unconditional with respect to the claims it sought to 'release and forever discharge,' including:
 " 'any claim, demand or demands, damages, action or actions, cause or causes of action which Alabama Power Company might have or could maintain by reason of any of the matters or things done or suffered to be done . . . and involving in any way . . . [the construction of Walter Bouldin dam].'
 "It is evident from that language that the whole point of the release was to preclude the parties from making any claims which arose out of a contractual relationship that had begun seven years earlier and work that had been completed for three years at the time the release was executed. The quoted language reflects the express intention o two sophisticated parties to 'forever' put to rest 'any' claims 'involving in any way' the construction of Walter Bouldin Dam.
". . . .
 "This court considered a similar situation in Barbour v. Poncelor, 203 Ala. 386, 83 So. 130
(1919). There, a release discharged 'any claim of any sort or description, growing out of, or arising out of the sale of any of the stock.' The plaintiff contended the agreement did not contemplate the possibility of a fraud claim against the defendant. This court stated:
 " ' "A release, therefore, shall be held to include all demands embraced by its terms, whether particularly contemplated or not; and parol evidence is not admissible to show that a certain claim was not in the minds of the parties." '
"203 Ala. at 393, 83 So. at 136."
Alabama Power Co., 445 So.2d at 252-53 (emphasis added inAlabama Power Co.). *Page 114 
With a general release, the parties obviously intend to release all claims — contract claims as well as tort claims. It is in this regard that the trial court erred.[2] If the parties had wanted to limit the release, they could have expressly reserved and excepted certain claims, including tort claims, from the release.
Because we hold that the trial court erred in its ruling that the release did not bar the conversion claim, we need not reach the remaining issues raised by HHC and RHS. We would note that, even if the conversion claim had not been barred by the release, we would doubt whether that claim should have been presented to the jury. See Covington v. Exxon Co.,551 So.2d 935 (Ala. 1989); Lewis v. Fowler, 479 So.2d 725 (Ala. 1985).
The Board contends that, in light of the trial court's ruling that the release did not bar the conversion claim, all the parties agreed that there was no reason to present the fraud in the inducement claim to the jury. The Board maintains that if this Court determines that the conversion claim is barred by the release, then the case should be remanded for a new trial on the issue of fraud in the inducement.
We have reviewed the record. It is apparent that the Board voluntarily withdrew its claim of fraud in the inducement from the jury's consideration. An appellate court will consider only those issues properly delineated as such and will not search out errors that have not been properly preserved. Ex parteRiley, 464 So.2d 92 (Ala. 1985); Humane Society of MarshallCounty v. Adams, 439 So.2d 150 (Ala. 1983).
88-787 REVERSED AND JUDGMENT RENDERED.
88-916 DISMISSED AS MOOT.
HORNSBY, C.J., and MADDOX, JONES, ALMON, SHORES, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
[1] The Board cross-appealed "in the event that the Supreme Court determines that the April 3, 1989, order of the trial court granting a remittitur of punitive damages was a timely exercise of the court's jurisdiction on the defendants' motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial." RHS and HHC filed with this Court a motion to strike the trial court's order of April 3, 1989, which was granted. Therefore, the Board's cross-appeal is moot.
[2] Our holding today, as it relates to the release of "claims," should be distinguished from the holding in our recent case referring to "any and all persons." In Pierce v. Orr,540 So.2d 1364 (Ala. 1989), we held that unnamed third-parties, referred to in a release as "any and all parties," who have paid no consideration and who do not otherwise occupy a privity relationship with the named payors, bear the burden of proving by substantial evidence that they are parties intended to be released. 540 So.2d at 1367.