[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 23 2001
THOMAS K. KAHN
CLERK

_____

No. 99-12095

_____

D. C. Docket No. 98-01704-CV-BU-S

ROYAL INSURANCE COMPANY
OF AMERICA, a.k.a. R.E. Grills
Construction Co., Inc.,

Plaintiff-Appellant,

versus

WHITAKER CONTRACTING CORP.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(February 23, 2001)**

Before BIRCH, BARKETT and ALARCON*, Circuit Judges.

_____
* Honorable Arthur L. Alarcon, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

BIRCH, Circuit Judge:

This appeal presents the issue of whether an indemnitor must indemnify the indemnitee when the underlying cause of action involves a nondelegable duty under state law to which the indemnitee is subject. Specifically, this case concerns whether a paving subcontractor should indemnify the insurer of the general contractor with the state for highway work when a motorist died because of obstructive barricades at the work site. The district judge granted summary judgment to the subcontractor. Because we do not consider present Alabama law to have resolved this precise issue, we certify the question to the Alabama Supreme Court.

## I. BACKGROUND

In November, 1993, R.E. Grills Construction Company, Inc. ("Grills") and the State of Alabama entered into a contract for widening, including grading, draining, and paving, 6.457 miles on Alabama Highway 75 in Blount County, Alabama. This contract incorporated portions of the Alabama Highway Department Standard Specifications for Highway Construction, 1992 Edition ("Standard Specifications"), which made Grills, as general or prime contractor, responsible for placement and maintenance of construction warning signs, barricades, and traffic control devices to insure public safety. These Standard

2

Specifications require that the general contractor, "shall assume full responsibility for the continuous and expeditious maintenance of all construction warning signs, barricades and other traffic control devices" and state that the general contractor "is not relieved of his responsibility to continuously review and maintain all traffic handling measures and insure himself that adequate provisions have been made for the safety of the public and workmen. Construction signs and other traffic control devices specified by plan details are considered the necessary requirements for satisfactory traffic control."[1] R1-1-3 (quoting Standard Specifications at §§

---

[1] The Standard Specifications that specifically are a part of Grills contract with Alabama provide:

> All barricades . . . shall be kept clean, legible, and in their proper position at all times. § 104.04(b)
>
> [The Contractor] shall provide and maintain in a safe condition temporary approaches or crossings and intersections with . . . roads [and] streets . . . . The Contractor shall furnish, erect, and maintain barricades, warning signs, delineators, flagmen, and pilot cars in accordance with Section "G", of the "Alabama Manual on Uniform Traffic Control Devises for Streets and Highways." § 104.04(d)
>
> The Contractor shall at all times conduct his work so as to insure the least possible obstruction to traffic. The safety and convenience of the general public and residents along the highway shall be provided for by the Contractor as specified under Article 104.04. § 107.07(a)
>
> Materials and equipment on the right of way shall be so placed as to insure minimum danger to the traveling public. § 107.07(b)
>
> The Contractor shall provide, erect and maintain all necessary barricades, suitable and sufficient lights, danger signals, signs, and other traffic control devices; . . . and shall take all necessary

3

740.03(c) and (d), which were incorporated in the contract between Grills and

Alabama for the subject road work).

On July 7, 1994, Grills entered into a subcontract with defendant-appellee,

Whitaker Contracting Corporation ("Whitaker") for the paving of the portion of

highway under the work contract between Grills and Alabama. This Grills form

> precautions for the protection of the work and safety of the public. Highways or parts of the work closed to traffic shall be protected by effective barricades . . . . No signs, barricades, lights or other protective devices shall be dismantled or removed without the permission of the Engineer. § 107.10
>
> The location . . . and horizontal and vertical placement with respect to the pavement of warning signs, barricades and other traffic control devices shall be as required by the plan details, AMUTCD and as directed or approved by the Engineer. The Contractor must advise and have the approval of the Engineer prior to installing or removing traffic control devices from the project. § 740.03(a)
>
> The Contractor shall assume full responsibility for the continuous and expeditious maintenance of all construction warning signs, barricades and other traffic control devices . . . . All items used for traffic control shall be generally maintained in its original placement condition and such maintenance will be considered a part of the original installation cost. § 740.03(c)
>
> Reference is made to Section 107 of the Specifications which covers the legal responsibilities of the Contractor to the traveling public. Although the Department will be designating and directing the placement of certain traffic control devices, the Contractor is not relieved of his responsibility to continuously review and maintain all traffic handling measures and insure himself that adequate provisions have been made for the safety of the public and workmen. Construction signs and other traffic control devices specified by plan details are considered the necessary requirements for satisfactory traffic control . . . . § 740.03(d)

R1-1-2-3 (alterations in original) (emphasis added).

4

subcontract contained an indemnity agreement by Whitaker regarding the work that it performed for Grills. That agreement purported "to indemnify and . . . exonerate" the contractor, Grills, "from all liability, claims and demands for bodily injury and property damage arising out of the Work undertaken by the Subcontractor . . . whether or not" such damage resulted "in whole or in part" from "conditions, acts, or omissions done or permitted by the Contractor." R1-15-Exh. E at 2 (quoting subcontract indemnity agreement between Grills and Whitaker).[2]

On April 11, 1996, Rhonda K. Chase was driving south on Highway 75 in Blount County on the portion of the roadway that was undergoing widening construction work pursuant to the contract between Grills and Alabama and the paving subcontract between Grills and Whitaker. At the intersection of Highway 75 and County Road 1, Vicky Hood Washburn proceeded onto the highway in Chase's path. Chase's vehicle collided into Washburn's vehicle; Chase

---

[2] The indemnity agreement in the subcontract between Grills and Whitaker provides:

> The Subcontractor covenants to indemnify and save harmless and exonerate the Contractor and the Owner of and from all liability, claims and demands for bodily injury and property damage arising out of the Work undertaken by the Subcontractor, its employees, agents or its subcontractors, and arising out of any other operation no matter by whom performed for and on behalf of the Subcontractor, whether or not in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner.

R1-15-Exh. E at 2.

subsequently died from the injuries that she sustained. At her deposition, Washburn testified that the barricades, barrels, and equipment on the construction site being paved obscured her ability to see north on Highway 75 and, thus, were contributing causes of the accident.[3] R1-15-Exh. I at 18, 28-29, 30-31, 35.

The administratrix of Chase's estate sued Whitaker, Washburn, and State Farm Mutual Automobile Insurance Company, Washburn's insurance carrier, in state court. The amended complaint added a negligence claim against Grills and alleged that Grills breached its duty of ordinary care in repairing and paving the intersection of Highway 75 and County Road 1 by failing to provide adequate barricades, signs, and safety devices to protect the public. The ensuing discovery revealed that the barricades that obstructed Washburn's view were traffic control devices placed and maintained by Grills under the supervision of the Alabama Department of Transportation. After initial placement on October 16, 1995, the barricades were maintained at least thirteen feet from the traveled lanes of Highway 75 until the date of the accident, when they were moved within three to five feet of the traveled lanes of Highway 75. Whitaker performed paving work at the subject intersection on the same day following the accident, and state

---

[3] Washburn also testified that she had to lean forward on her steering wheel to attempt to get a clear view of oncoming traffic from the north. R1-15-Exh. I at 33, 34, 226.

inspectors moved the barricades away from the involved traveled lanes of Highway 75 immediately after arriving at the accident scene. There is no direct evidence in the record that Whitaker personnel moved the barricades.[4]

Prior to trial, the administratrix settled her claim against Whitaker for $250,000 and her claim against Grills for $400,000, an amount paid by plaintiff-appellant Royal Insurance Company of America ("Royal") under the terms of its general liability insurance policy with Grills. Relying on Whitaker's indemnity agreement in its subcontract with Grills, Royal then filed the underlying indemnity case in federal court under 28 U.S.C. § 1332, diversity jurisdiction. In the course of that litigation, David B. Nooney, Vice President of Grills with twenty-five years of experience with road construction contracts, testified at his deposition that Grills would be responsible under its contract with Alabama, even if an accident or injury were caused by a subcontractor.[5] Similarly, George S. Mahon, Jr., the Royal agent

---

[4] Royal's George S. Mahon, Jr., who handled the settlement of the claim against Grills, testified that there was no witness testimony or photographic evidence that Whitaker moved the barricades at the accident scene. R1-15-Exh. J at 23-24. Additionally, he testified that the notes that he received from his manager stated: "Co-defendant paving contractor should be dismissed, as they were not there at the time." Id. at 41.

[5] The relevant questions and Nooney's responses are as follows:

> Q. . . . Having looked at that indemnity agreement, in your practical opinion–or given your practical experience, in your opinion, is the subcontractor required to indemnify the contractor for bodily injury caused by the contractor's negligence?
> A. No.

who handled the state litigation and settlement in this case and who had twenty years of experience in handling insurance claims, testified at his deposition that the ultimate liability that Grills had under its contract with Alabama was the reason for settlement with Chase's estate.[6]

---

. . . .

Q. . . . <u>You understood</u>, though, that Grills was responsible for this job and under the contract with the State of Alabama in the event–<u>whether it was Whitaker or any other subcontractor that did something that caused an accident, that Grills could be responsible based on the contract that you had with the State of Alabama</u>?
A. <u>Yes</u>.

R1-15-Exh. K at 14-15, 43 (emphasis added).

[6] Pertinent portions of Mahon's deposition testimony are as follows:

Q. While you were handling the underlying lawsuit, were you aware of the potential liability of Grills for not having enough barricades or barrels at the subject intersection at the time of the accident?
A. We were certainly aware of Grills' exposure to that type of claim.

. . . .

Q. Is that [the allegation that Grills negligently placed the barricades and barrels originally irrespective of Whitaker's moving them] something you factored in in deciding to settle the underlying case?
A. Well, we were looking . . . at it from the standpoint that <u>Grills, as the general contractor, had the overall responsibility for what happened out there, whether Grills was directly at fault or whether one of its subs did it.</u>

. . . .

Q. What was your rationale for settling the case?
A. First off, <u>Grills was the general contractor, and we had overall responsibility</u>. We had a fatality; there were low limits on the two vehicles involved. We knew that the barricades had been moved; they were definitely out of compliance with the State specs, and that's basically it.

8

Whitaker moved for summary judgment and argued that Grills was ultimately liable under its contract with Alabama for the roadwork. Finding no material facts at issue, the district judge granted Whitaker summary judgment as to its liability under the indemnity agreement. In this appeal, Royal argues that the district judge failed to apply state indemnity law.

## II. DISCUSSION

We review a district court's granting summary judgment <u>de novo</u> and apply the same legal standards used by the district court. <u>Hilburn v. Murata Elecs. N. Am., Inc.</u>, 181 F.3d 1220, 1225 (11th Cir. 1999). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). While

----

. . . .
Q. So it's your understanding that if one of Whitaker's contracting trucks ran over a pedestrian that R.E. Grills would have to pay for that?
A. Depends on the facts in the case, but <u>ultimately, Grills could be responsible</u>.
. . . .
Q. Thus Grills could have been exonerated with regard to the allegations made by the Plaintiff pertaining to the initial placement of the barricades but <u>R.E. Grills could still be found liable as a result of Whitaker Contracting's conduct based on the contract that Grills had with the State of Alabama</u>?
A. <u>Absolutely</u>.
R1-15-Exh. J at 17, 18, 22, 29, 52 (emphasis added).

factual issues and reasonable inferences therefrom are considered in favor of the non-moving party, the district court's legal determinations are reviewed <u>de novo</u>. <u>Hilburn</u>, 181 F.3d at 1225. "The interpretation of an insurance contract is a question of law subject to <u>de novo</u> review." <u>Galindo v. ARI Mut. Ins. Co.</u>, 203 F.3d 771, 774 (11th Cir. 2000). A federal court sitting in diversity must apply state substantive law. <u>Allison v. Vintage Sports Plaques</u>, 136 F.3d 1443, 1445 (11th Cir. 1998) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 58 S.Ct. 817 (1938)). Thus, "we are bound to decide the case the way it appears the state's highest court would." <u>Towne Realty, Inc. v. Safeco Ins. Co.</u>, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988).

A. <u>Nondelegable Duty of a General Contractor</u>

While Alabama law generally does not hold a prime or general contractor liable for independent acts of a subcontractor, the general contractor remains liable to third parties under two exceptions: (1) the type of work performed, regardless of the care and skill used, probably will cause damage, "'or is necessarily and intrinsically dangerous'" or (2) "[t]he general contractor 'is responsible for the manner of the performance of his nondelegable duties, though done by an

independent contractor.'"[7] Clark v. Jackson, 549 So.2d 85, 86 (Ala. 1989)

(citations omitted).  With respect to road construction involving excavations,  the

Alabama Supreme Court stated that "our cases have long recognized that one

causing or initiating excavations on or about the public thoroughfares of this state

owes to the public a nondelegable duty to protect travelers from an unreasonable

risk of harm caused by the excavations."  Sims v. Star-Mindingall Water Sys., 619

So.2d 1368, 1369 (Ala. 1993).  In reversing a directed verdict for the general

contractor, the court confirmed the application of the nondelegable-duty exception

for safety of the roadway, although the plumbing subcontractor placed the dirt pile

into which the motorist collided in the roadway lane of travel.  See id.  Application

of Sims in this case shows that Grills cannot escape its nondelegable duty to insure

a safe roadway for the traveling public by arguing that the cause of Chase's

accident and death was Whitaker's placement of the barricades and barrels because

provision and maintenance of these warning objects was a necessary and integral

part of the road construction that Grills contracted to perform for Alabama.  See id.

Furthermore, Alabama's contract with Grills specifically created a

nondelegable duty in Grills, the general contractor, to maintain a safe roadway for

_____

[7] While both exceptions are applicable to this case, we conclude that the nondelegable-duty exception is sufficient and dispositive as to Grills's ultimate responsibility for public traveling safety on the portion of the roadway undergoing widening for the duration of the road construction project.

11

the traveling public during the road construction work. In addition to requiring Grills to provide and maintain safe intersections, to insure the least obstruction to traffic, to place materials and equipment to insure minimum danger to the traveling public, and to maintain the original placement of all barricades and other traffic control devices, the contract expressly stated:

> The Contractor shall assume full responsibility for the continuous and expeditious maintenance of all construction warning signs, barricades and other traffic control devices. . . . .[T]he Contractor is not relieved of his responsibility to continuously review and maintain all traffic handling measures and insure himself that adequate provisions have been made for the safety of the public . . . .

R1-1-3; see Jones v. Power Cleaning Contractors, 551 So.2d 996, 998 (Ala. 1989) ("It is clear from the contract that the contractor . . . had a specific duty to provide a safe workplace for the workmen. This duty did not end once the work had been subcontracted."). The contract between Grills and Alabama imposed upon Grills a nondelegable duty to inspect and to maintain continuously all traffic handling measures to insure the safety of the traveling public. Because of its nondelegable duty under its contract with Alabama, Grills remained responsible for placement of the barricades, the moving of which obstructed Washburn's view and contributed to her collision with Chase that resulted in Chase's death. Consequently, Grills settled the case with Chase's administratrix for $400,000, which Royal paid. See

supra note 6 (Royal's agent Mahon testified that Grills, as general contractor, settled the case because it had "overall responsibility").

B. Subcontract Indemnity Agreement

We have established that Grills had a nondelegable duty under its contract with Alabama and state law to maintain the safety for the traveling public of the roadway which it contracted to widen. This necessarily included the area which Whitaker had been subcontracted to pave and which was the location of Chase's fatal accident. In this appeal, we must decide whether the indemnification agreement in Whitaker's subcontract with Grills entitles Royal to reimbursement from Whitaker of the $400,000 plus interest, costs, and attorney's fees that it has paid for Grills's settlement. Therefore, the issue to be resolved is whether Grills's nondelegable duty to provide a safe roadway for the traveling public, which was not stated specifically in the indemnity agreement, affects our analysis of this agreement under which Royal proceeds for reimbursement.

The Alabama Supreme Court has decided that indemnity agreements between private parties are valid where "the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language." Industrial Tile, Inc. v.

13

Stewart, 388 So.2d 171, 176 (Ala. 1980). Nevertheless, the Alabama Supreme Court subsequently clarified how strictly the "'clear and unequivocal language'" of the indemnity agreement is to be construed. Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 945 (Ala. 1983) (quoting Industrial Tile, 388 So.2d at 176). "Agreements by which one party agrees to indemnify another for the consequences of the other's acts or omissions are carefully scrutinized," and such an agreement "is enforceable only if the indemnity provisions are unambiguous and unequivocal." City of Montgomery v. JYD Int'l, Inc., 534 So.2d 592, 594 (Ala. 1988).

In Brown, the Alabama Supreme Court instructed that three factors are to be considered by a court interpreting an indemnity agreement: (1) "contractual language," (2) "identity of the draftsman of the language," and (3) "the indemnitee's retention of control." Brown, 431 So.2d at 946. While particular language in the indemnity agreement is not required, the requisite intent of the parties must be clear.[8] See id. at 945. Ambiguous language[9] in an indemnity

_____

[8] The indemnity agreement that the Alabama Supreme Court upheld in Industrial Tile as specifically requiring indemnification of the plant owner by an independent contractor for the electrocution and injury of workers renovating its plant provided:

The Contractor [Industrial Tile] shall be solely responsible to indemnify and hold harmless the Owner . . ., its agents, servants and employees, from and against any and all claims, losses, suits, damages, judgments, expenses, costs and charges of every kind and nature, whether direct or indirect, on account of or by reason of, bodily injuries (including death) to any person or persons, including, but not

14

limited to its agents, servants and employees or other of the Owner, Contractor or any subcontractor and injury to or destruction of property (including the loss of use thereof) of the Owner, or others arising out of or occurring in connection with the performance of the work to be done pursuant to the contract and whether or not caused by or contributed to, or alleged to have been caused by or contributed to, by the active, passive, affirmative, sole or concurrent negligence or breach of any statutory duty, whether non-delegable or otherwise on the part of the owner or its agents, servants or employees, or liability therefor imputed as a matter of law to the owner and/or its agents, servants or employees or from the failure of or any condition in materials or parts or faulty workmanship furnished by the Owner, Contractor or any Sub-Contractor and/or their respective agents, servants or employees pursuant to the Contract.

Industrial Tile, 388 So.2d at 175 (alteration in original) (emphasis added).

 The indemnification contract language in Brown did not clearly and unequivocally state an intent that the subcontractor indemnify the contractor for the contractor's negligence, specifically, the failure to supervise its subcontractor's work. Brown, 431 So. 2d at 945-46. In contrast, the indemnity agreement upheld in Industrial Tile specified in detail the acts or omissions for which the independent contractor would indemnify the owner; relevant to this case is inclusion of the indemnitee's breach of statutory or nondelegable duties. See id. at 945; see also Crigler v. Salac, 438 So.2d 1375, 1386 (Ala. 1983) (per curiam) (finding that the subject indemnification agreement did not clearly evidence an intent to indemnify against the indemnitee's particular negligence and contrasting the language of the Industrial Tile indemnification agreement, including the indemnification for the indemnitee's concurrent negligence or breach of any statutory or nondelegable duty, which met "the clear indication test").

 The language of the indemnity agreement in Whitaker's subcontract with Grills does not specifically obligate Whitaker to indemnify Grills for breach of its nondelegable duty to insure the safety of the roadway as did the indemnity agreement in Industrial Tile, which specifically included indemnity for nondelegable duties. Thus, we do not know whether "all liability, claims and demands for bodily injury and property damage arising out of the Work undertaken by the Subcontractor . . . whether or not in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner" encompasses the nondelegable duty that Grills had under its underlying contract with Alabama and under state law to maintain the safety of the highway under construction for the safety of the traveling public. R1-15-Exh. E at 2 (emphasis added). We note that Grills's Vice President with twenty-five years of experience with road construction contracts testified that Grills would not be entitled to indemnity by Whitaker on the language of the indemnity agreement. See supra note 5. Experienced business establishments are capable of agreeing with specificity regarding the coverage of indemnity agreements. See Humana Med. Corp. v. Bagby Elevator Co., Inc., 653 So.2d 972, 975 (Ala. 1995) (recognizing that the indemnity agreement between two business entities failed to include the specific language which would be required for the indemnitee to be indemnified by the indemnitor).

15

agreement is construed against the drafter.  See id. at 946.[10]  Finally, we must

consider "the degree of control retained by the indemnitee over the activity or

property giving rise to liability."  Brown, 431 So.2d at 946; see City of

Montgomery, 534 So.2d at 595 ("The more control the indemnitee retains over the

area, the less reasonable it is for the indemnitor to bear the responsibility for

injuries that occur in that area.").[11]

---

[9] Ambiguous contract language is susceptible of more than one meaning, while unambiguous contract language clearly states one reasonable meaning.  See Alfa Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 684 So.2d 1295, 1299-1300 (Ala. 1996).

[10] Like the indemnity contract language at issue in Brown, the indemnity agreement in Whitaker's subcontract with Grills occurs in Grills's preprinted form subcontract.  See Brown, 431 So.2d at 946; R1-15-Exh. E.  "When one seeks indemnification from another for damages that were caused by his own negligence, strict construction of the indemnity agreement against the contractor is particularly appropriate."  Craig Construc. Co. v. Hendrix, 568 So.2d 752, 757 (Ala. 1990) (involving an almost identically worded indemnification agreement to the one in this case); see Humana, 653 So.2d at 975 (distinguishing Industrial Tile because the subject indemnity provision was ambiguous with respect to the indemnitor's indemnifying the indemnitee for the consequences of the indemnitee's acts).

[11] We are mindful that a public works contract, implicating policy issues, was the underlying contract for which Grills subcontracted with Whitaker for the paving and that a member of the public, not an employee of the contracting parties, died because of the failure of Grills to execute its nondelegable duty of providing a safe roadway for the traveling public.   The Alabama Supreme Court has recognized that allowing "the indemnitee to transfer financial responsibility to the indemnitor" when the indemnitee has ultimate control and responsibility for the safety of the area where an accident occurred "would be totally at odds with the tort system's incentives to encourage safety measures."  City of Montgomery, 534 So.2d at 595.

The district judge concluded that the indemnity agreement in this case is "ambiguous" and "grammatically meaningless."[12] R1-20-5. Even if we were to supply "due" under Alabama rules of contract construction[13] to overcome the ambiguity of the wording of the indemnity agreement at issue, as Royal suggests, we cannot resolve this appeal because we do not have direction from the Alabama

---

[12] As written, the questioned indemnity provision of the subcontract between Grills and Whitaker states: "The Subcontractor covenants to indemnify and save harmless and exonerate the Contractor and the Owner of and from all liability, claims and demands for bodily injury and property damage arising out of the Work undertaken by the Subcontractor, its employees, agents or its subcontractors, and arising out of any other operation no matter by whom performed for and on behalf of the Subcontractor, whether or not in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner." R1-15-Exh. E at 2. The district judge found that the clause "whether or not in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner" was nonsensical in the context of the indemnity agreement/sentence because it "modifies the word 'Work.'" R1-20-5-6. This interpretation results in liability for work done by Whitaker, the subcontractor, "to" actions or omissions done by Grills, the contractor. The district judge stated that "[i]t is nonsense to state that a person could actively 'do' an omission or that another person could perform work 'to' that omission." Id. at 6. He concluded that "this construction of the indemnity clause would only permit indemnification for claims arising out of the negligence of the subcontractor, not based on the contractor's own negligence." Id.

[13] Royal, the drafter, argues that Alabama rules of contract construction can be read to permit supplying "due" in the challenged indemnity agreement to give the entire indemnity provision meaning rather than making this omission the basis of the interpretive focus. See, e.g., Attorneys Ins. Mut. of Ala., Inc. v. Smith, Blocker & Lowther, P.C., 703 So.2d 866, 870 (Ala. 1996) ("Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions."); Green v. Merrill, 308 So.2d 702, 704 (Ala. 1975) ("It is well settled that the terms of an insurance policy are to be given a rational and practical construction. . . . [P]rovisions of a policy which clearly indicate the parties' real intent are not to be given a strained construction to raise doubts where none exist." (citation omitted)). If "due" were inserted, as Royal urges, then the last clause of the indemnity agreement would read: "whether or not in whole or in part [due] to conditions, acts or omissions done or permitted by the Contractor or Owner," and the interpretive problem exposed by the district judge would be rectified.

17

Supreme Court that this indemnity agreement would include indemnity for Grills's failure to perform its nondelegable duty to insure a safe roadway for the traveling public when this omission is not specifically stated in the indemnity agreement as it was in <u>Industrial Tile</u>.[14]

Accordingly, we certify to the Supreme Court of Alabama pursuant to Alabama Rule of Appellate Procedure 18 the following question:

> MUST AN INDEMNITY AGREEMENT SPECIFICALLY STATE THAT AN INDEMNITOR WILL INDEMNIFY THE INDEMNITEE FOR A NONDELEGABLE DUTY TO WHICH THE INDEMNITEE IS SUBJECT UNDER STATE LAW TO REQUIRE INDEMNIFICATION FOR THE FAILURE TO EXECUTE SUCH NONDELEGABLE DUTY, WHICH RESULTS IN THE UNDERLYING CAUSE OF ACTION FOR WHICH INDEMNIFICATION IS SOUGHT?

Our statement of the certified question is not meant to limit the scope of inquiry by the Alabama Supreme Court. The entire record in this case, together with the parties' briefs, are to be transmitted herewith.

---

[14] We recognize that <u>Industrial Tile</u> did not concern the omission of a nondelegable duty. Nevertheless, the <u>Industrial Tile</u> indemnity agreement, approved by the Alabama Supreme Court, was explicit in detailing the acts or omissions to which indemnity applied. We have not found an Alabama Supreme Court case involving the fact situation present in this appeal of an underlying cause of action that results from failure to perform a nondelegable duty under state law for which indemnity is sought.

QUESTION CERTIFIED.